UNITED STATES of America,
Plaintiff–Appellee,

v.

Alfred Arnold AMELINE,
Defendant–Appellant.

No. 02–30326.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 4, 2003.*

Filed July 21, 2004.

* The Panel unanimously finds this case suitable for decision without oral argument.

Brian P. Fay, Angel Law Firm, Bozeman, Montana, for the appellant.

Lori Harper Suek, Assistant United States Attorney, Great Falls, Montana, for the appellee.

Before: WARDLAW, GOULD, and PAEZ, Circuit Judges.

PAEZ, Circuit Judge.

Alfred Ameline appeals his 150 month sentence that was imposed after he pled guilty to knowingly conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. In his initial appellate brief, Ameline challenged his sentence on two grounds. First, Ameline contended that because he objected to the amount of methamphetamine attributed to him in the Presentence Report ("PSR") the district court erred when it considered the PSR as "prima facie evidence of the facts" and required Ameline to disprove its contents relating to drug quantities. Second, Ameline contended that the district court's drug quantity finding was clearly errone-

ous because it was based on multiple layers of unreliable hearsay evidence.

In post-submission briefing, Ameline argued that the imposition of his sentence violates the Sixth Amendment as recently interpreted by the Supreme Court in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) because the facts underlying the calculation of his base offense level and his sentence enhancement were not found by a jury beyond a reasonable doubt. If Ameline is correct that the *Blakely* rule applies to the United States Sentencing Guidelines, his other two claims become irrelevant, as they assume both the wrong decision-maker and the wrong standard of proof. We examine *sua sponte* whether the *Blakely* rule applies to sentences imposed under the Sentencing Guidelines. We hold that *Blakely*'s definition of statutory maximum applies to the determination of the base offense presumptive ranges under § 2D1.1(c) of the Sentencing Guidelines, as well as the determination of the applicability of an upward enhancement under § 2D1.1(b)(1). As a result, we hold that Ameline's sentence, based on the district court's finding by a preponderance of the evidence of 1,603.60 grams of methamphetamine—despite Ameline's admission of only a detectable amount of methamphetamine—violates Ameline's Sixth Amendment right to a jury trial. Because we may *sua sponte* review an issue based on a change in the law by the Supreme Court, we hold that we may properly review Ameline's *Blakely* claim and conclude, regardless of whether we apply the harmless or plain error standard, that the district court violated Ameline's right to have the facts underlying his sentence found beyond a reasonable doubt. Finally, we hold that the *Blakely* rule's effect on the determination of a base offense level under § 2D1.1(c) and an upward enhancement under § 2D1.1(b)(1) do not render the Sentencing Guidelines facially invalid. Accordingly, we vacate Ameline's sentence and remand for resentencing.

## I.

## Background

Ameline pled guilty to knowingly conspiring to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. His plea agreement did not contain an agreement as to a specific quantity of methamphetamine for purposes of sentencing, but rather left that determination to the district court at the time of sentencing. At Ameline's change of plea hearing, he disputed the government's offer of proof that he distributed one and a half kilograms of methamphetamine, but admitted that "some methamphetamine" was involved in his offense conduct. At the end of the hearing, Ameline's counsel reiterated this point: "[W]e do vigorously oppose the amounts that the government attributes to Mr. Ameline. And at the sentencing hearing, we anticipate bringing in quite a few witnesses ... I would ask that the court set aside the better part of a day. I mean, I'm kind of anticipating trial on the amounts of drugs involved is what I'm anticipating."

The PSR prepared by the Probation Office attributed 1,079.3 grams of methamphetamine to Ameline for purposes of applying the drug equivalency table found in U.S.S.G. § 2D1.1(c), resulting in a recommended base offense level of 32. The PSR also recommended a two level enhancement pursuant to § 2D1.1(b)(1) for possession of a weapon in connection with the offense on the basis of hearsay testimony by a confidential informant that Ameline sold the confidential informant methamphetamine in exchange for a rifle, and that he once witnessed Ameline threaten his son with a handgun.

After the probation officer disclosed the draft PSR to Ameline and the government, Ameline, as required by the court's April 30, 2002 Sentencing Order, presented the probation officer with a series of objections to the quantities of methamphetamine attributed to him in the report. Ameline also objected to the two paragraphs that formed the basis of the § 2D1.1(b)(1) enhancement—possession of a gun—as "false." In his letter objecting to the draft PSR, Ameline explained the basis for his objections and the evidence on which he would rely at the sentencing hearing. The probation officer dismissed Ameline's objections and reaffirmed his determination of the quantity of methamphetamine in the original PSR, as well as the upward enhancement. As the probation officer explained in an addendum to the PSR:

> The information obtained for purposes of inclusion in the Offense Conduct section of the report is based solely on the official investigative reports provided by the Cascade County Sheriff's Office and the Federal Bureau of Investigation. Subsequent to receipt of the objections to the Presentence Investigation Report from the defendant's attorney, this officer again discussed investigative matters and reference to official reports with Detective Dan Kohm, Cascade County Sheriff's Office, and Special Agent Phil Niedringhaus, Federal Bureau of Investigation, to verify the validity contained in the investigative report. Both Detective Kohm and Agent Niedringhaus question the credibility of the individuals the defendant wishes to bring forward to provide testimony for the defendant in support of a lower drug amount. Both Kohm and Niedringhaus indicate that the CI is a reliable source of information.
>
> As a result, this Officer stands by the original information provided in the Presentence Investigation Report and the

total drug amount weight calculated as 1.08 kilograms of methamphetamine.

In Ameline's Sentencing Memorandum, dated September 3, 2002, he again objected to the amount of methamphetamine attributed to him in the PSR. Specifically, Ameline objected to the amount of methamphetamine the probation officer sought to attribute to him in paragraphs 13, 17, 24 and 28 of the PSR. Paragraph 13 of the PSR alleged that Ameline met with "Toro," aka Shawn Rodriguez, in Great Falls, Montana where Toro "fronted" Ameline a pound and a half of methamphetamine (680.4 grams). According to the PSR, the source of this information was not Toro, but rather a cooperator and co-defendant, Victor Saucedo, who claimed to have been told this by Toro. Paragraph 17 alleged that Jamie Swan gave Ameline ten ounces of methamphetamine (283.5 grams). Swan had supposedly received the methamphetamine he gave to Ameline from co-defendant Michael Lamere. Paragraph 24 attributed 113 grams of methamphetamine to Ameline based on three sales of methamphetamine to Ameline by a confidential informant. Paragraph 28 attributed two grams of methamphetamine to Ameline based on statements Reuben McDowell made to investigators that he had twice dealt one gram quantities of methamphetamine to Ameline.

At the beginning of the sentencing hearing, before any witnesses were called, the district judge informed the parties how he intended to proceed:

> It is the position of this court in this matter, as it is in all such cases, that the facts as recited in the presentence report are prima facie evidence of the facts set out there; that if the defendant challenges the facts set forth in the presentence report, it is the burden of the defendant to show that the facts con-

tained in the report are either untruthful, inaccurate, or otherwise unreliable. The district judge then asked defense counsel to call his first witness. However, before counsel called any witnesses, the court again reiterated its position:

[I]t is my position that the statements in the presentence report, that is, statements of fact, are reliable on their face and prima facie evidence of the facts there stated. And I will be taking those into account to the extent relevant to the obligations that I have in fashioning sentence and fixing responsibility for drug quantities, *if they are not overcome by other evidence presented at this hearing.* Be guided accordingly. (emphasis added).

Consistent with his objections, Ameline presented testimony from Toro to dispute the amount of methamphetamine attributed to him in paragraph 17 of the PSR. Toro testified that he provided Ameline with three ounces of methamphetamine in October 1999, but that Saucedo was not present when the transaction took place. Toro further testified that he never told Saucedo that he had provided Ameline with one and a half pounds of methamphetamine. As to the amount of methamphetamine attributed to Ameline in paragraph 17 of the PSR by the statement of Jamie Swan, Ameline presented the testimony of Michael Lamere who testified that Swan was not in charge of selling the one pound quantity of methamphetamine that he supposedly distributed part of to Ameline. Lamere testified that Jamie Swan was mistaken in his belief that Ameline received 10 ounces of the one pound quantity of methamphetamine. As to paragraph 24 of the PSR, Ameline called the confidential informant, Dan Metcalf, to testify about his transactions with Ameline. Metcalf testified that he and Ameline engaged in four or five transactions for a total of three ounces of methamphetamine. Ameline called Reuben McDowell to dispute the contents of paragraph 28 of the PSR. McDowell testified that, contrary to the assertion in paragraph 28, he had never dealt any quantities of methamphetamine to Ameline.

At the conclusion of the hearing, the district court found that 1,603.60[1] grams of methamphetamine were attributable to Ameline, for a base offense level of 34. The district court stated "I should let all parties know that all findings are based upon a preponderance of the evidence standard and are established at least to that standard in the view of the court." The district court found the § 2D1.1(b)(1) enhancement "undisputed" for an offense level of 36, but deducted three points for timely acceptance of responsibility, for a total offense level of 33. The district court sentenced Ameline to 150 months, in the middle of the 135 to 168 month range provided by the Sentencing Guidelines.

## II.

### Analysis

*A. Can We Consider Ameline's Post–Submission Argument Regarding Blakely?*

As noted, Ameline initially challenged the district court's determination that he bore the burden of disproving the factual statements in the PSR relating to drug quantity and the court's determination that

---

1. This amount was greater than that recommended by the PSR. The PSR described two additional transactions in paragraphs 20 and 21, but the probation officer did not include those transactions in calculating the overall drug amount. The district court, however, included the amounts described in those two paragraphs, thus establishing an even higher base offense level.

the hearsay evidence used to prove drug quantity was sufficiently reliable. On November 4, 2003, when Ameline's case was submitted, he contested neither the preponderance of the evidence standard used by the judge nor the propriety of the judge as factfinder.

On June 24, 2004, the Supreme Court issued its decision in *Blakely*, which raised the possibility that Ameline's initial challenges had been subsumed by a violation of his Sixth Amendment rights. The *Blakely* court addressed a provision of Washington State's determinate sentencing law that allowed a judge to impose a sentence above the standard statutory sentencing range if the judge found, by a preponderance of the evidence, that certain offense aggravating factors existed that justified a sentence in excess of the "standard range." ‒‒‒ U.S. at ‒‒‒, 124

S.Ct. at 2535. In *Blakely*, the trial court utilized this authority to impose a 90 month sentence, even though the standard range for Blakely's offense, second-degree kidnapping, was 49 to 53 months. *Id.* In striking down Blakely's enhanced sentence, the Court explained "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."* *Id.* at 2537 (emphasis in original). Thus, because the jury did not determine the factual basis for the enhanced sentence, and Blakely did not admit the facts, his enhanced sentence could not survive a Sixth Amendment challenge.

With its clarification of a defendant's Sixth Amendment rights, the *Blakely* court worked a sea change in the body of sentencing law.[2] We would be remiss if

**2.** This sea change is evidenced by *Blakely's* immediate impact on Guideline sentencing throughout the federal system. Our sister circuits have already split on the applicability of the *Blakely* rule to sentences imposed under the Guidelines. *See United States v. Booker*, 375 F.3d 508, 513, 2004 WL 1535858 at *4 (7th Cir. Jul.9, 2004) (holding federal Sentencing Guidelines unconstitutional as applied to sentence enhancement based on facts not determined jury), *but see United States v. Pineiro*, 377 F.3d 464, 467, 2004 WL 1543170, at *2 (5th Cir. Jul.12, 2004) (holding that *Blakely* does not extend to the federal Sentencing Guidelines). The Second Circuit took a third route and certified its questions regarding the applicability of the *Blakely* rule to Guideline sentences to the Supreme Court. *See United States v. Penaranda*, 375 F.3d 238, 2004 WL 1551369 (2d Cir. Jul.12, 2004).

Most courts that have examined *Blakely's* effect on sentences imposed under the Guidelines have found certain applications of the Guidelines to be unconstitutional. *See Booker*, 375 F.3d 508, 512, 2004 WL 1535858 at *3; *United States v. Leach*, 2004 U.S. Dist. LEXIS 13291, at *3 (E.D.Pa., July 13, 2004); *United States v. Montgomery*, (D.Utah July 8, 2004), 2004 U.S. Dist. LEXIS 12700, at *7; *United States v. Toro*, 2004 WL 1575325, at *5 (D.Conn. July 08, 2004); *United States v. Shamblin*, 323 F.Supp.2d 757, 2004 WL

1468561 (S.D.W.Va. June 30, 2004), 2004 U.S. Dist. LEXIS 12288, at *13; Transcript of Resentencing Hearing, *United States v. Watson*, CR 03–0146, at 11–13 (D.D.C. June 30, 2004) *available at http://www.ussguide.com/members/cgi-bin/index.cfm;* Transcript of Sentencing Hearing, *United States v. Fanfan*, No. 03–47–P–H (D. Me. June 28, 2004) *available at http://www.ussguide.com/members/cgi-bin/index.cfm.*

Of those courts that have found a particular application of the Guidelines unconstitutional, a minority have held the entire Guidelines sentencing scheme unconstitutional. *See United States v. King*, No. 6–04–cr–35, *slip op.* at 10 (M.D.Fl. July 19, 2004), *United States v. Einstman*, 325 F.Supp.2d 373, 2004 WL 1576622 (July 14, 2004); *United States v. Croxford*, No. 2:02–CR–00302–PGC, 2004 U.S. Dist. LEXIS 12825, at *1 (D.Utah July 12, 2004); *United States v. Medas*, 323 F.Supp.2d 436, 2004 WL 1498183 (E.D.N.Y. July 1, 2004).

Finally, echoing the Fifth Circuit's decision in *Pineiro*, two district courts have concluded that *Blakely's* holding is inapplicable to Guideline sentences. *See United States v. Harris*, 2004 U.S. Dist. LEXIS 13290, at *1 (W.D.Pa., July 16, 2004); *United States v. Olivera–Hernandez*, No. 2:04CR 0013, at 3; 2004 U.S. Dist. LEXIS ‒‒‒ (D.Utah July 12, 2004).

we did not examine if and how *Blakely* applies to sentences imposed under the Guidelines. *See DeGurules v. INS,* 833 F.2d 861, 863 (9th Cir.1987) ("[A] fundamental principle of our jurisprudence is that a court will apply the law *as it exists when rendering its decision* ... [T]his principle applies even when a change to existing law occurs during the pendency of an appeal.") (emphasis added).

■ Our precedent provides ample support for our authority to consider *sua sponte* a claim that was not initially raised on appeal. We have previously "examine[d] *sua sponte* the application of [a] recent Supreme Court opinion" when it appeared that a "controlling authority has made a contrary decision of law applicable to this issue." *United States v. Garcia,* 77 F.3d 274, 276 (9th Cir.1996). *See also Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1488 (9th Cir.1995) ("We will review an issue that has been raised for the first time on appeal under certain narrow circumstances," including "when a change in law raises a new issue while an appeal is pending."); *In re Skywalkers, Inc.,* 49 F.3d 546, 548 n. 4 (9th Cir.1995) ("change in law pending appeal permits entertainment of issue not theretofore raised.").

Ameline's case squarely presents such a situation. If the *Blakely* rule does apply to sentences imposed under the Sentencing Guidelines, and therefore, to Ameline's sentence, Ameline's initial arguments are beside the point. His initial challenges assume a federal sentencing scheme where the district judge, not the jury, determines the material facts that may increase the severity of punishment using a preponderance of the evidence standard, not proof beyond a reasonable doubt. Assuming *Blakely* does implicate sentences imposed under the Guidelines, as Ameline has argued in his post-submission briefing, to simply address Ameline's initial arguments would be to answer questions that may no longer be relevant to federal criminal sentencing.

Although Ameline made no challenge to the applicable standard of proof or to the judge's factfinding authority, we hold that the Sixth Amendment implications of *Blakely* allow us to examine *sua sponte* its potential impact on Ameline's sentence. We therefore consider as a matter of first impression whether the *Blakely* rule applies to sentences imposed under the Sentencing Guidelines.

*B. Does the Sixth Amendment Right Announced in Blakely Apply to Sentences Imposed Under the United States Sentencing Guidelines?*

■ We join the Seventh Circuit in holding that there is no principled distinction between the Washington Sentencing Reform Act[3] at issue in *Blakely* and the United States Sentencing Guidelines. *Booker,* 2004 WL 1535858, at *3. While the *Blakely* court only addressed the Washington State sentencing scheme,[4] the manner in which the majority defined the "statutory maximum" compels us to conclude that its reasoning applies with equal force to the Sentencing Guidelines.

The federal Sentencing Guidelines scheme created by the 1984 Sentencing Reform Act[5] is remarkably similar to the

---

**3.** Wash. Rev.Code Ann. § 9.94A.390 (2000).

**4.** Indeed, the Supreme Court expressly noted that "The Federal Guidelines are not before us, and we express no opinion on them." *Blakely,* —— U.S. at ——, n. 9, 124 S.Ct. at 2538, n. 9.

**5.** The Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551, *et. seq.,* 28 U.S.C. §§ 991–998.

Washington State sentencing scheme. In *Blakely* there were two state sentencing statutes at issue. The statute setting the sentence ranges for each class of felony offenses in Washington designated ten years as the maximum punishment for Blakely's second degree kidnapping offense. Wash. Rev.Code Ann. § 9A.20.021(1)(b); —— U.S. at ——, 124 S.Ct. at 2535. Washington's Sentencing Reform Act, however, specified in a separate statutory provision a "standard range" of 49 to 53 months for Blakely's offense. Wash. Rev.Code Ann. § 9.94A.320. The trial court could exceed this range only if the court found a "substantial and compelling reason justifying an exceptional sentence." —— U.S. at ——, 124 S.Ct. at 2535. Under Washington's Sentencing Reform Act there were several potential factors that would support a judge's decision to depart from the presumptive range. *Id.* In Blakely's case, the trial court found that Blakely had acted with "deliberate cruelty," one of the enumerated factors justifying an exceptional sentence. *Id.*

In ruling that the Sixth Amendment right to a jury trial rendered Blakely's exceptional sentence unconstitutional, the Court did not focus on the ten-year statutory maximum, but rather the "standard range" of 49 to 53 months established by the Sentencing Reform Act.

[T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* ... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Id.* at 2537 (internal citations omitted).

The Court held that the trial judge's sentence of 90 months violated this principle because it was not justified "solely on the basis of facts admitted in the guilty plea" but rather involved judicial fact-finding of aggravating factors which increased the sentence. *Id.*

Ameline was similarly subject to dueling "statutory maximums." Under 21 U.S.C. § 841(b)(1)(C), he faced a potential sentence of 0 to 20 years. However, Congress also provided, through its implicit adoption of U.S.S.G. § 2D1.1(c), a differing range of presumptive sentences based on the quantity of drugs, including methamphetamine, as determined by the district judge or admitted by the defendant.[6] Here, with the district judge's factual findings, Ameline faced a base offense level of 34, with a sentencing range of 151 to 188 months.[7] Solely on the basis of Ameline's

**6.** As the Fifth and Seventh Circuits have explained, the district court was not at liberty to ignore the Guidelines in making these findings, and indeed would do so at the peril of being reversed. *Pineiro*, 377 F.3d 464, 470, 2004 WL 1543170, at *6 ("Like the judge who disregards the Washington sentencing rules, a federal judge who disregards the Guidelines does so on pain of reversal. The Guidelines Manual is not a catalog of mere suggestions."); *Booker*, 375 F.3d 508, 511, 2004 WL 1535858, at *2 ("The vices of the guidelines are thus that they *require* the sentencing judge to make findings of fact (and to do so under the wrong standard of proof) ...."). *See also United States v. Bahe*, 201 F.3d 1124, 1129 n. 5 (9th Cir.2000) ("Of course, when the Commission issues actual guidelines ..., we are required by prior case law to make them binding.").

**7.** As noted, he also faced an additional two point upward enhancement for possession of a gun pursuant to § 2D1.1(b)(1) solely on the basis of the district judge's finding.

admission of distributing a detectable amount of methamphetamine, "without any additional findings," *Blakely,* —— U.S. at ——, 124 S.Ct. at 2537, his base offense level would have been 12 with a sentencing range of 10 to 16 months. Although we have held that the "statutory maximum" for *Apprendi* purposes is the statute of conviction[8] (here, § 841(b)(1)(C)), *Blakely's* definition of "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant,*" —— U.S. at ——, 124 S.Ct. at 2537 (emphasis in original), suggests this conclusion was in error.

Here Ameline only admitted to a detectable amount of methamphetamine.[9] On the basis of this admission alone, the maximum sentence under the Guidelines that the district judge could have imposed— without any further findings—would have been 16 months, given a base offense level of 12.[10] *See* U.S.S.G. § 2D1.1(c)(14) (base offense level 12 applies when the offense involved "[l]ess than 2.5 G of Methamphetamine, or less than 250 MG of Methamphetamine (actual)"). Instead, the district court imposed a sentence of 150 months, based on a base offense level of 34, a two level upward enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm, and a three-point reduction for acceptance of responsibility which far exceeded the maximum sentence that the

district judge could have imposed simply on the basis of facts admitted by Ameline. This directly parallels the sentencing process held unconstitutional in *Blakely.*

The government argues that the Sentencing Commission's unique status as an independent Commission within the judicial branch compels the conclusion that the *Blakely* rule is inapplicable to sentences imposed under the Guidelines. We are unpersuaded. In supplemental briefing, the government argued that because the Sentencing Guidelines are not "legislatively enacted," but are rather a "unique product of a special delegation of authority" to an independent Commission in the judicial branch, the Guidelines cannot set the relevant statutory maximums under *Blakely.* Presumably even the government would concede that had Congress first prescribed the presumptive sentencing ranges to the Sentencing Commission, the Sentencing Guidelines would be indistinguishable from the Washington sentencing scheme as the ranges would be "legislatively enacted."

We are unconvinced that the Congressional delegation of authority to the Sentencing Commission to set presumptive sentencing ranges in the first instance creates any meaningful distinction. Congress retains the authority to, and indeed must, ratify the Guidelines. Every Sentencing Guideline promulgated by the Commission

---

**8.** *See United States v. Hernandez–Guardado,* 228 F.3d 1017, 1026–27 (9th Cir.2000).

**9.** We previously have held that "even where due process requires that a drug quantity allegation be pleaded in the indictment and proved to a jury beyond a reasonable doubt, a defendant can plead guilty to the elements of the offense without admitting the drug quantity allegation." *United States v. Thomas,* 355 F.3d 1191, 1198 (9th Cir.2004). Here, neither the Superseding Information nor the Indictment charged a specific drug quantity. Nonetheless, at the change of plea hearing the

government proffered that Ameline agreed to distribute between one and one and a half kilograms of methamphetamine. Ameline and his counsel vigorously disputed this characterization and admitted to only a detectable amount of methamphetamine at the plea colloquy. In these circumstances, Ameline's guilty plea did not constitute an admission of the amount proffered by the government.

**10.** With one prior conviction for "Issuing a Bad Check" in 1996, Ameline was in criminal history Category I.

must be ratified by Congress, which "can revoke or amend any or all of the Guidelines as it sees fit either within the 180–day waiting period or at any time." *Mistretta v. United States*, 488 U.S. 361, 393–94, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); 28 U.S.C. § 994(p). The Court has previously held that the Sentencing Guidelines have the force of law, *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), and "bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases." *Mistretta*, 488 U.S. at 391, 109 S.Ct. 647. *See also Bahe*, 201 F.3d at 1129 n. 5. Congress has utilized this authority to shape the Guidelines directly, twice rejecting attempts by the United States Sentencing Commission to modify the powder to crack cocaine sentencing ratio. More recently, Congress acted directly to amend the Guidelines regarding child pornography, limiting judicial discretion to depart downward and changing the appellate standard of review of criminal sentences. *See* PROTECT Act, Pub.L. 108–21, 117 Stat. 668–69, 671–73 (2003). In short, we agree with the Seventh Circuit that "[t]he pattern [of the Guidelines] is the same as that in the Washington statute, and it is hard to believe that the fact that the guidelines are promulgated by the U.S. Sentencing Commission rather than by a legislature can make a difference." *Booker*, 375 F.3d 508, 511, 2004 WL 1535858, at *2.[11]

We similarly are unconvinced by the government's assertion that our review is barred by *Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998) and other cases upholding sentences under the Guidelines against a variety of constitutional challenges.[12] It is true that if *Edwards* dismissed a Sixth Amendment challenge to the Guidelines we would not be free to revisit that holding, even if it was manifestly inconsistent with *Blakely*. *See State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("it is [the Supreme Court's] prerogative alone to overrule one of its precedents"); *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (courts of appeals must leave to "this Court the prerogative of overruling its own decisions," even if such decision "appears to rest on reasons rejected in some other line of decisions") (citations omitted). However, we agree with the Seventh Circuit that *Edwards* did not do so, and therefore it is not an obstacle to our review. *Booker*, 375 F.3d 508, 514, 2004 WL 1535858, at *4–5.

The Court in *Edwards* explicitly stated "we need not, and we do not, consider the merits of petitioners' statutory and constitutional claims." 523 U.S. at 516, 118 S.Ct. 1475. A review of the petitioners' brief in *Edwards* reveals that the constitutional claim advanced was that it was improper

---

**11.** In certifying questions regarding *Blakely* to the Supreme Court, the Second Circuit noted "That the Sentencing Guidelines are not promulgated by Congress could prove critical to the determination of whether or not they are affected by *Blakely.*" *Penaranda*, 375 F.3d 238, 245, 2004 WL 1551369, *5. We disagree. That Congress must ratify any guideline, and retains ultimate control over the shape of the Guidelines, compels the conclusion that there is no meaningful distinction between the determinate sentencing scheme under the Washington Sentencing Reform Act and the Sentencing Guidelines.

**12.** The government also cites *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), *Witte v. United States*, 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) and *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). *Watts* upheld a Guidelines sentence against a Fifth Amendment Double Jeopardy Clause challenge. 519 U.S. at 157, 117 S.Ct. 633. *Witte* similarly involved a Double Jeopardy challenge. 515 U.S. at 406, 115 S.Ct. 2199. *Dunnigan* concerned a Fifth Amendment right to testify challenge. 507 U.S. at 96, 113 S.Ct. 1111.

for the district judge to determine the object of the drug conspiracy—either cocaine or cocaine base—when the jury's general verdict was ambiguous as to the drug involved. *See* Brief for Petitioners, 1997 WL 793079, at *30–31 ("Petitioners are entitled to have the jury determine what illegal agreement the Petitioners formed and agreed to participate in.").

This was an argument about the Sixth Amendment's effect on 21 U.S.C. § 846, not the Sixth Amendment's effect on the application of the Sentencing Guidelines. *Id.* at *32 ("The government's construction of Section 846, and the lower courts' decisions, would violate Petitioners' Sixth Amendment and Due Process rights to a unanimous jury verdict *on the offense of conviction.*") (emphasis added). Edwards did not argue that the Guidelines sentencing scheme violated his Sixth Amendment right to a jury trial; indeed, Edwards presumed that had the jury identified whether cocaine or cocaine base was the object of the conspiracy, the district court could have properly determined the quantity of the identified drug at sentencing consistent with the Sixth Amendment. "The Court did not opine on the guidelines' consistency with the amendment because that consistency was not challenged. It did not rebuff a Sixth Amendment challenge to the guidelines because there was no Sixth Amendment challenge to the guidelines. We are obligated therefore to make our own constitutional determination." *Booker,* 375 F.3d 508, 514, 2004 WL 1535858, at *5.[13]

■ The government also briefly argues that a panel of this court cannot overturn circuit precedent, and we previously have held that the Sentencing Guidelines do not violate the rule of *Apprendi. See United States v. Hernandez–Guardado,* 228 F.3d 1017, 1026–27 (9th Cir.2000). However, when an intervening Supreme Court case undermines one of our previous holdings, a subsequent panel may revisit that issue without convening an en banc court. *See Miller v. Gammie,* 335 F.3d 889, 899–900 (9th Cir.2003) (en banc). In light of *Blakely,* we are not bound by *Hernandez–Guardado's* (and subsequent cases') rejection of a Sixth Amendment challenge to the Guidelines.

Therefore, we hold that the Sixth Amendment right announced in *Blakely* applies to sentences imposed pursuant to the Federal Sentencing Guidelines. As such, we must consider *Blakely's* effect on Ameline's sentence.

*C. In Light of Blakely, Was Ameline's Sentence Permissible Under the Guidelines?*

■ Our jurisdiction over Ameline's *Blakely* claim necessarily requires us to determine the standard of review. Because Ameline did not object to his sentence on the grounds that the Sentencing Guidelines or the procedures used to determine the material sentencing facts were unconstitutional under *Apprendi,* or on the ground that the material sentencing facts were not alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt, we review for plain error. *See*

---

**13.** The flood of post-*Blakely* scholarship supports this conclusion. *See, e.g.,* Nancy J. King & Susan R. Klein, *Beyond Blakely,* 16 Fed. Sentencing Rep. ——, n. 21 (forthcoming June 2004) (*available at http://sentencing.type-pad.com/sentencing_law_and_policy/files/kingklein_beyond_blakely.pdf*) ("We agree with Judge Posner on this point."); Stephanos Bibas, *Blakely's Federal Aftermath,* 16

Fed. Sentencing Rep. ——, 6 (forthcoming June 2004) (*available at http://sentencing.type-pad.com/* sentencing_law_and_policy/files/bibas_blakelys_federal_aftermath.pdf) ("Because *Edwards* did not squarely resolve a *Blakely* challenge, lower courts are not bound to reject *Blakely* challenges to the Guidelines.").

*United States v. Cotton,* 535 U.S. 625, 628–29, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

*Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal citations and quotations omitted).

The district court's finding by a preponderance of the evidence, after weighing multiple levels of hearsay testimony, that Ameline should be responsible for 1,603.60 grams of methamphetamine was plain error. First, "[d]eviation from a legal rule is 'error' unless the rule has been waived." *United States v. Olano,* 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). As discussed above, the determination of Ameline's base offense level (and two point upward enhancement for possession of a gun) by the district judge employing a preponderance of the evidence standard was error under *Blakely.*

■ Second, in determining whether the error was plain, the Court has explained that it is sufficient for the error to be clear under the law as it exists at the time of appeal. *See Johnson,* 520 U.S. at 468, 117 S.Ct. 1544 ("Where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' at the time of appellate consideration."). It is clear after *Blakely* that increasing Ameline's punishment based on facts not admitted by him or determined by a jury beyond a reasonable doubt (or by the district judge with a jury waived) was clearly contrary to his Sixth Amendment jury right.

■ For an error to affect "substantial rights" "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. Ameline raised specific objections to paragraphs 13, 17, 24 and 28 of the PSR, all of which were based on varying degrees of hearsay. In challenging the reliability of these hearsay statements, Ameline presented numerous witnesses directly involved in the described transactions who disputed the PSR's recommended base offense level of 32, all of whom raised serious questions regarding the total quantity of drugs attributable to Ameline. It cannot be seriously disputed that the lower standard of proof affected the outcome of his ultimate sentence.[14]

Finally, the error affected the fairness of Ameline's proceedings. In discussing the fairness of the result in *Blakely,* the Court stated:

> Any evaluation of *Apprendi's* "fairness" to criminal defendants must compare it

14. We note that even without the benefit of *Blakely,* we still would have vacated Ameline's sentence because once Ameline raised specific, timely objections to the methamphetamine quantity determination in the PSR, the government could not rely on the PSR to meet its burden of establishing the factual basis for the base offense level under U.S.S.G. § 2D1.1(c). We previously held in *United States v. Howard* that the government "bear[s] the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level." 894 F.2d 1085, 1090 (9th Cir. 1990); *see also United States v. Charlesworth,* 217 F.3d 1155, 1158 (9th Cir.2000). By treating the factual statements in the PSR as presumptively accurate, and placing the burden on Ameline to disprove them, the district court relieved the government of its sentencing burden and required Ameline to establish the factual basis for a lower base offense level than the one recommended in the PSR, thus committing error even in the pre-*Blakely* era.

with the regime it replaced, in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, see 21 U.S.C. §§ 841(b)(1)(A), (D), based not on facts proved to his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong.

*Blakely,* —— U.S. at ——, 124 S.Ct. at 2542.

This is precisely what happened to Ameline. Although he admitted to only a detectable amount of methamphetamine, and vigorously challenged the reliability of the hearsay evidence presented in the PSR to increase his base offense level, he was nonetheless sentenced by the district judge based on the preponderance standard to a significantly higher sentence.[15]

■ Therefore, we hold that the district judge's imposition of this sentence after determining the material sentencing facts by a preponderance of the evidence, rather than relying on a jury's determination of the facts beyond a reasonable doubt, violated Ameline's Sixth Amendment rights as explained in *Blakely.*

### D. Are the Sentencing Guidelines Severable?

The government argues that if we find *Blakely* applicable to any facet of Ame-line's sentence, then we must hold that the Guidelines as a whole are unconstitutional. We disagree.

■ We have held that *Blakely* applies to the procedure the district court followed to determine Ameline's base offense level under § 2D1.1(c) and the two level upward enhancement pursuant to § 2D1.1(b)(1). We do not invalidate either the base offense levels in § 2D1.1(c) or the two level enhancement in § 2D1.1(b)(1). Rather, we hold that in determining a base offense level under § 2D1.1(c) or an upward enhancement under § 2D1.1(b)(1), in order to be consistent with *Blakely,* those determinations must be made by a jury beyond a reasonable doubt (or by a judge with proper jury waiver).

■ As the government notes, this application of *Blakely* affecting the manner in which certain Sentencing Guidelines will be applied is arguably in tension with § 6A1.3 and 18 U.S.C. § 3742. The commentary to § 6A1.3 explains "The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." To the extent that, as a result of *Blakely,* predicate factual determinations must be made by the reasonable doubt standard before § 2D1.1(c) and § 2D1.1(b)(1) can be ap-

---

15. *Blakely's* application to the Sentencing Guidelines will likely lead to greater accuracy in sentencing. We have long held "a defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information." *United States v. Petty,* 982 F.2d 1365, 1369 (9th Cir.1993). A jury finding beyond a reasonable doubt material sentencing facts that will increase the level of punishment, as opposed to a district judge making such findings by a preponderance of the evidence, will likely lead to more reliable information during the sentencing process. While theoretically the disputed hearsay relied upon to increase Ameline's base offense level to 34 might have satisfied the district court that it was more likely true than not, it is far less certain that its questionable reliability would satisfy a jury (or district judge, assuming a proper jury waiver) beyond a reasonable doubt that Ameline had engaged in distribution of those amounts.

plied, this commentary conflicts with the Sixth Amendment and is unconstitutional as applied in certain circumstances. Section 3742 providing for appellate review of district court sentences under the Guidelines appears to contemplate that it is the district judge's responsibility to make the requisite findings of fact at sentencing. *See* 18 U.S.C. § 3742(e) (courts of appeals "shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous . . . ."); *see also* Fed.R.Crim.P. 32(i)(3)(B) (district court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute"). The assumption behind this provision (and Rule 32), that the district court will make the requisite findings of fact, is unconstitutional under *Blakely* in cases absent a jury waiver.

However, we decline the government's invitation to invalidate the Guidelines wholesale and to permit the district court unfettered discretion on resentencing to sentence Ameline to a term within the statutory range of 0 to 20 years. Instead, we hold that, although these procedural aspects of applying the Sentencing Guidelines violate Ameline's Sixth Amendment right to a jury trial, they are severable.

■ We begin with the "presumption . . . in favor of severability," a presumption that is based on the idea that "a court should refrain from invalidating more of the statute than is necessary" because "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Regan v. Time,* 468 U.S. 641, 652–53, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). Reflecting this presumption, the test for determining severability provides that "[u]nless it is evident that the Legislature would not have enact-

ed those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Refining Co. v. Corp. Comm'n of Okla.,* 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932). As this standard implies, the issue is "essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).

■ We therefore turn to Congress' intent in enacting the Sentencing Guidelines. Congress had three objectives in mind when it enacted the Guidelines: honesty, uniformity and proportionality. U.S.S.G. § 1A1.1, cmt. 3 (2003). Congress sought to promote honesty in sentencing by eliminating the indeterminate sentencing system under which defendants often served far less than the sentence imposed by the district court. Congress' second purpose was to achieve "uniformity" by "narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders." *Id.* Finally, Congress intended that the Guidelines would also ensure proportionality by treating different criminal conduct differently. In short, Congress' goal was to eliminate the uncertainty that accompanied indeterminate sentencing.

The Sentencing Guidelines will still promote this goal even if the requirements for judge fact finding by a preponderance of the evidence are severed as violating the Sixth Amendment in circumstances like those confronting Ameline. The Sentencing Guidelines seek to achieve these Congressional objectives because they contemplate similar sentences once a given set of facts are found to exist. Although severance would change how those facts are determined, and by whom, severance would have no effect on the Congressional

goal of achieving consistency of sentences in cases that involve similar offense conduct. In fact, were we to hold that *Blakely* precludes application of the Guidelines as a whole, we would do far greater violence to Congress' intent than if we merely excised the unconstitutional procedural requirements. We are reluctant to establish by judicial fiat an indeterminate sentencing scheme.[16] Absent the Sentencing Guidelines, we would return to a system of indeterminate sentencing with all of its attendant problems. Rather than undermining Congress' objectives, severance facilitates them.

 It is true of course, as the government argues, that the Sentencing Guidelines will not function in the exact same manner as they did pre-*Blakely*. Unless a defendant admits facts as part of his guilty plea or at sentencing, or waives his right to a jury, juries, not judges, will make the material factual findings, and they will do so by employing a higher standard of proof. But the test for severability is not, as the government seems to suggest, whether the statute will function identically to the way it operated before the objectionable provisions were severed. If this actually were the test for severance, severance would never be appropriate. Rather, the test is "whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). In terms of severability, it is inconsequential whether Congress enacted the Guidelines with the assumption that district judges would make sentencing findings, that a preponderance of the evidence standard would be employed, or even that similar procedures would be employed for enhancements and downward departures [17] unless such procedures were critical to the goals of honesty, uniformity and proportionality. As explained above, they are not.

The government's only attempt at arguing otherwise is unavailing. The government suggests that severance would undermine uniformity because even though similar defendants may have committed similar crimes, "[i]t would likely be impossible, as a practical matter, to charge and prove to a jury beyond a reasonable doubt *all* enhancing factors in *all* cases." In other words, defendants who were in fact similar might be treated differently because the government may be less able in one case to fulfill its burden of persuasion than in another case. This, of course, also occurred when district judges determined material sentencing facts on the basis of a preponderance of the evidence standard. The Sentencing Guidelines, however, seek to promote uniformity by providing a structure that encourages similar sentences for defendants with similar offense conduct. Although that goal may be elusive in some instances, we are reluctant, in light of Congress' declared goals, to abandon completely the Sentencing Guidelines in this case.

Indeed, *Blakely* seems to contemplate that its holding can apply to determinate sentencing schemes without wholesale invalidation. The opinion itself notes that it "is not about whether determinate sen-

---

**16.** We are mindful, however, that the Sentencing Guidelines are not immune from criticism. *See, e.g.*, Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts (1998).

**17.** As *Blakely* only concerned the burden of proof required to enhance a sentence, we do not address its application to downward departures. As Ameline's *Blakely* rights were not implicated by the district court's grant of a three level downward departure for acceptance of responsibility, upon remand, the district court retains discretion to depart downward.

tencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment." —— U.S. at ——, 124 S.Ct. at 2540. *Blakely* did not rule that Washington's Sentencing Reform Act was unconstitutional on its face, rather only that the aspects of the statute which required a judge to find facts by a preponderance of the evidence that increased the level of punishment beyond the standard range were in violation of the Sixth Amendment.

In sum, the government has failed to overcome the presumption in favor of severability. Moreover, severance does not interfere with Congress' intent in enacting the Guidelines. To the contrary, preserving the essential provisions of the Guidelines that are not constitutionally infirm will effectuate Congressional intent by preventing a return to the days of indeterminate sentencing.

### E. Proceedings On Remand

Because we conclude that Ameline has the right to have a jury decide the facts underlying the determination of his base offense level and his two level firearm enhancement beyond a reasonable doubt, we must reverse the district court's judg-

ment and remand for resentencing. Should the government abandon its attempt to hold Ameline responsible for 1,603.60 grams of methamphetamine, the maximum sentence the district court could impose on Ameline at resentencing could solely be based on his admissions.[18]

■ However, should the government seek to obtain a higher sentence for the offense of conviction, the district court may convene a sentencing jury to try the drug quantity and firearm issues, which, if proven beyond a reasonable doubt, may be used to increase Ameline's sentence.[19] As the Seventh Circuit in *Booker* noted, federal courts have long employed bifurcated juries in the capital punishment context, as well as in the civil context where a jury may only determine damages once it has separately determined liability. "There is no novelty in a separate jury trial with regard to the sentence, just as there is no novelty in a bifurcated jury trial." 375 F.3d 508, 514, 2004 WL 1535858, at *5; *see also United States v. Khan*, 2004 U.S. Dist. LEXIS 13192 at *16 (E.D.N.Y. July 12, 2004) (noting the success of the bifurcated jury system in capital cases).[20]

**18.** We note that while Ameline admitted only to a detectable amount of methamphetamine at his change of plea hearing, at the sentencing hearing he testified to having distributed four and a half ounces of methamphetamine in connection with this offense. However, at the time Ameline testified he mistakenly thought the burden of proof regarding drug quantity was preponderance of the evidence. Moreover, the district court already had committed error by requiring Ameline to disprove the drug quantities described in the PSR, inaccurately placing the burden of persuasion on the defense—which may well have motivated Ameline to testify. In light of these errors, we allow the district court to decide in the first instance whether Ameline's statements at the sentencing hearing constitute admissions for *Blakely* purposes.

**19.** Of course, Ameline may waive his right to a jury and try the factual issues before the court, with the court determining the facts beyond a reasonable doubt.

**20.** The application of *Blakely* to a district court's sentencing determination obviously differs depending upon the procedural posture of a given case. In cases pending on direct appeal such as Ameline's, upon remand, a district court may either sentence a defendant on the basis of the facts contained in the plea agreement, admitted during the plea colloquy or at sentencing, or found by the jury beyond a reasonable doubt. A district court may also convene a special sentencing jury if necessary. In cases where jury trials have already commenced, a district court may bifurcate the guilt and penalty phases, or convene a separate sentencing

Our decision to remand for resentencing is not precluded by double jeopardy concerns. *See, e.g., Pennsylvania v. Goldhammer*, 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985). Unless the facts sought to be proven by the government to enhance Ameline's sentence constitute elements of a statutory offense required to be alleged in the original indictment, the constitutional prohibition of double jeopardy would not be implicated. U.S. Const. amend. V, cl. 2.

 Imposition of a new sentence on remand constitutes a second punishment in violation of the Double Jeopardy Clause only if the defendant has a legitimate expectation of finality in his original sentence by the time his new sentence is imposed. *United States v. Radmall*, 340 F.3d 798, 800 (9th Cir.2003); *Stone v. Godbehere*, 894 F.2d 1131, 1135 (9th Cir.1990); *United States v. McClain*, 133 F.3d 1191, 1193 (9th Cir.1997). A defendant has no legitimate expectation of finality in a sentence which he places in issue by direct appeal. *United States v. Moreno–Hernandez*, 48 F.3d 1112, 1116 (9th Cir.1995). Ameline has directly appealed his sentence, and therefore, cannot have a legitimate expectation of finality. Thus, imposition of a new sentence on remand would not constitute a violation of the Double Jeopardy Clause.

jury. Finally, in cases awaiting trial, district courts may utilize the options discussed above, or they may elect to give the jury a special verdict form if the introduction of evidence related to sentencing is not excluded as unduly prejudicial or irrelevant. Unlike in cases that were in the appellate pipeline when *Blakely* was decided or where trial had already begun, in a case currently awaiting trial the court (or counsel with the court's approval) may voir dire potential jury members with their new responsibility in mind. Counsel will be able to use their opening and closing arguments to address relevant sentencing facts and to introduce evidence relating to

## III.

## Conclusion

Accordingly, Ameline's sentence is **VACATED** and **REMANDED** for resentencing consistent with this opinion.

GOULD, Circuit Judge, dissenting.

*Blakely* does not conclusively require that we hold constitutionally invalid the application of the Federal Sentencing Guidelines ("Guidelines") to Ameline. The United States Supreme Court's prior opinions have upheld the constitutionality of the Guidelines. I agree with Part II.A of the Fifth Circuit's opinion in *United States v. Pineiro*, 377 F.3d 464, 2004 WL 1543170 (5th Cir. July 12, 2004), analyzing the impact of *Blakely* and holding that the Guidelines are not affected by it. I also agree with the dissent in *United States v. Booker*, 375 F.3d 508, 515–21, 2004 WL 1535858, at *6–*11 (7th Cir. July 9, 2004) (Easterbrook, J., dissenting). While reasonable jurists may now disagree on the long-range impact of the reasoning of *Blakely*, in the short run we remain bound to apply the Guidelines unless and until the Supreme Court holds otherwise.[1]

Before *Blakely*, the Supreme Court had held that federal courts are bound by the Guidelines and by their policy statements and commentary. *See Stinson v. United*

those necessary facts. Moreover, the district judge will be able to instruct fully the jury as to its factfinding role. *See generally*, Bibas, *supra* n. 13 at 978.

**1.** Though I disagree with the majority's analysis of the impact of *Blakely*, and believe the district court properly could apply the Guidelines in total, I would still vacate Ameline's sentence under a different theory: The district court erred in shifting from the government to Ameline the burden of proof for the facts in the Presentence Report about drug quantity. I agree with the majority's observation on this issue in its footnote 14.

*States*, 508 U.S. 36, 42, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ("The principle that the Guidelines Manual is binding on federal courts applies as well to policy statements."). The Supreme Court's prior opinions also have upheld the Guidelines against a constitutional challenge to congressional delegation of power to the judiciary through the Sentencing Commission. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court has further held that federal judges may find facts that require higher sentences under the Guidelines. *See, e.g., United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam) (upholding an enhancement for possession of a gun in connection with a drug offense, even though the jury had acquitted the defendant on the firearms charge); *Witte v. United States*, 515 U.S. 389, 401–03, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (upholding a higher Guidelines sentence on a defendant convicted of possessing marijuana based on the judge's finding that the offender also participated in an uncharged cocaine conspiracy). While in *Mistretta, Watts*, and *Witte*, the Supreme Court did not deal explicitly with a Sixth Amendment challenge, nothing the Court said in those cases cast any constitutional shadow on the Guidelines.

In *Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998), Justice Breyer wrote for a unanimous Supreme Court in a case considering the respective powers of judges and juries in the context of the Guidelines. The Supreme Court upheld a higher sentence imposed on a defendant for crack-related activities despite that the jury had convicted the defendant on an ambiguous instruction involving cocaine *or* crack. The Court held in no uncertain terms that "[t]he Sentencing Guidelines instruct *the judge* in a case like this one to determine both the amount and the kind of 'controlled substances' for which a defendant should be held accountable—and then to impose a sentence that varies depending upon amount and kind." *Id.* at 514, 118 S.Ct. 1475. The Court reasoned that the enhancement was constitutional because it did not push petitioner over the statutory limit for a cocaine-only conspiracy.[2]

Against all this, the majority argues that the Supreme Court's precedents applying and enforcing the Guidelines count for nothing because none explicitly addresses the precise Sixth Amendment issue that was the focus of *Blakely*. There is some force in this argument. But it seems odd to hold that twenty years of a regime of sentencing reform, implemented by Congress and elaborated upon by the judiciary through the Sentencing Commission, is swept away by the reasoning of *Blakely*, a case that expressly says it does not address the Guidelines.[3] Rather, it is prema-

---

**2.** I find unpersuasive the majority's distinction between Edwards's challenge to judge-made determinations of drug types, and his implicit but still valid challenge to judge-made determinations that raised his sentence based on elements beyond those on which the jury had convicted him. My view that *Edwards* impliedly rejects the notion that the Guidelines contravene the Sixth Amendment is supported by the Fifth Circuit, *see Pineiro*, 377 F.3d 464, 471, 2004 WL 1543170, at **7–8, and by Judge Easterbrook in dissent, *see Booker*, 375 F.3d 508, 516, 2004 WL 1535858, at **6–7.

**3.** In first *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and recently in *Blakely*, the Supreme Court explicitly said that it was not holding the Guidelines unconstitutional. Justice Scalia's majority opinion in *Blakely*, stated: "The Federal Guidelines are not before us, and we express no opinion on them." —— U.S. ——, —— n. 9, 124 S.Ct. 2531, 2538 n. 9, 159 L.Ed.2d 403. Given this disclaimer, the majority opinion in *Blakely* cannot be read as conclusive in its impact on the Guidelines. And while the dissenting opinions in *Blakely*

ture to lament or to celebrate the demise of the Guidelines in any respect.[4] Such a decision, with its drastic impact on the administration of criminal law and potentially on tens of thousands of cases, in my view should come from the Supreme Court, or from Congress,[5] or not at all.

Because the Supreme Court has previously upheld the Sentencing Guidelines against varied constitutional challenges, we cannot properly overrule this course of precedent in anticipation of a new directive that the Court has not yet issued. This limit on our power is abundantly clear from prior Supreme Court precedent. *See, e.g., Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (instructing lower courts to "leav[e] to this Court the prerogative of overruling its own decisions") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)); *State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Our Circuit has followed this prec-

edent. In *Hoffman v. Arave,* 236 F.3d 523, 542 (9th Cir.2001), we recognized and applied *Agostini,* maintaining that "it is not our place to engage in anticipatory overruling." *See also United States v. Pacheco–Zepeda,* 234 F.3d 411, 414 (9th Cir. 2000) ("[S]peculation does not permit us to ignore controlling Supreme Court authority."). It would be better if we here followed the letter and spirit of the Supreme Court's pronouncement in *Agostini.*

Although I understand those who would contend that the logic of the majority opinion in *Blakely* compels the result my colleagues reach, "[t]he life of the law has not been logic," as Justice Holmes observed, "it has been experience." OLIVER WENDELL HOLMES, *The Common Law* 1 (1881). Considering the experience of our federal court system with sentencing reform under the Guidelines for twenty years, the prior Supreme Court precedent friendly to the Guidelines, and the array of disruptive issues that will necessarily follow in *Blakely*'s train if it is applied to the Guidelines,[6]

---

characterized the majority holding as fatal to the Guidelines, dissents cannot by their nature determine the necessary impact of a majority holding. With the history of our criminal law process, federal sentencing policy since 1984, and the Supreme Court's prior precedents concerning the Guidelines informing our views, we should hesitate to bypass the presumption of constitutionality that must now be given the Guidelines.

**4.** For a "blog" on the internet cataloguing in detail recent developments relating to *Blakely,* see "Sentencing Law and Policy" at http://sentencing.typepad.com, a website of Professor Douglas A. Berman of the Moritz College of Law at The Ohio State University.

**5.** Congress can render moot the current constitutionality issues by legislating a different approach to sentencing in the light of *Blakely.*

**6.** For a general overview of complexity involved in applying *Blakely* to the Guidelines, see the statements and testimony offered to

the Senate Judiciary Committee's July 13, 2004 hearing entitled, *"Blakely v. Washington* and the Future of the Federal Sentencing Guidelines," at http://judiciary.senate. gov/hearing.cfm?id=1260. The Senate Judiciary Committee's hearing opened with statements by Senator Orrin Hatch, its Chairman, and Senator Patrick Leahy, the Ranking Democratic Member of the Committee. Testimony followed, with written statements also deposited in the record. The written statements available on the website include those by William Mercer, U.S. Attorney for District of Montana and Chairman of the Attorney General's Advisory Committee to the Senate Judiciary Committee; Judge William K. Sessions III and Commissioner John Steer, Vice Chairs of the Sentencing Commission; Judge Paul Cassell, U.S. District Judge for the District of Utah; Chief U.S. District Judge Lawrence Piersol for the District of South Dakota; Professor Frank Bowman of the Indiana University School of Law; Assistant Professor Rachel Barkow of the New York University School of Law; former U.S. Attorney Alan

I conclude that the Supreme Court itself is the proper Court to decide if the Guidelines are constitutionally infirm in any fundamental way.[7]

I respectfully dissent.

Vinegrad; and Ronald Weich, former Special Counsel to the U.S. Sentencing Commission. With the multitude of expert voices proliferating on this nascent topic, in my view it is prudent to await the Supreme Court's resolution of the issue, for that presents an opportunity where the Court, if it wishes, can offer more guidance on ancillary issues that may flow from *Blakely* if it is to be applied to the Guidelines.

7. If the Guidelines are constitutionally invalid in whole or in part under *Blakely*'s reasoning, then I would have reservations whether my colleagues are correct in thinking any constitutional vice is severable from the Guidelines as a whole. For a discussion of this topic, see the Senate Judiciary Committee testimony of Professor Frank Bowman of the University of Indiana Law School, and District Judge Paul Cassell's opinion in *United States v. Croxford*, 324 F.Supp.2d 1230, 1245,

2004 WL 1521560, at *12 (D.Utah July 7, 2004). The majority's view that the Guidelines cannot be constitutionally applied here to determine the level of criminal offense or to determine a particular enhancement raises questions of severability. Given that the application of *Blakely* to the Guidelines may require, among other things, changes to grand jury procedure, new forms of arraignments, revision of plea colloquy procedures, resolution of novel evidence and trial issues, whole new forms of jury instructions, possibly a bifurcated trial for sentencing, and decision on a host of other issues perhaps not yet identified, it may be questioned nonetheless whether Congress and the Sentencing Commission could have intended that the system they created should proceed as the majority would modify it. Because I would hold the Guidelines constitutional in the case before us, I need not reach this issue of severability,

and, though acknowledging my misgivings, reserve judgment.