UNITED STATES of America,
Plaintiff–Appellee,

v.

Kim Renee SMITH, Defendant–
Appellant.

No. 03–30482.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 2004.

Filed Oct. 15, 2004.

Jeremy S. Yellin, Havre, MT, for the defendant-appellant.

Joseph E. Thaggard, Assistant United States Attorney, Great Falls, MT, for the plaintiff-appellee.

* The Honorable Clyde H. Hamilton, Senior Circuit Judge, United States Court of Appeals for the Fourth Circuit, sitting by designation.

Before: B. FLETCHER, HAMILTON,* and BERZON, Circuit Judges.

B. FLETCHER, Circuit Judge:

Kim Renee Smith ("Smith") was convicted of retaliating against a federal witness in violation of 18 U.S.C. § 1513(b)(2). She appeals her conviction and thirty-three month sentence. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm Smith's conviction but remand for re-sentencing.

I.

Smith is an enrolled member of the Blackfeet Indian tribe who grew up on the Blackfeet reservation in Browning, Montana. At the time Smith committed the crime at issue in this appeal, she lived primarily in Phoenix with her husband, Gordon Smith, and her two youngest children. The family maintained a summer home in Browning. Smith's aunt and uncle, Lori and Galen LaPlante, lived next door to Smith's Browning home with their three children.

In December 2001, a family in Smith's Browning neighborhood reported a burglary. The FBI investigated, and the La-Plantes' daughter reported that she had seen one of Smith's older children, Wesley Crawford, taking things from the burglarized home. Crawford was charged with the burglary on June 24, 2002.[1]

On July 16, 2002, Smith went to the LaPlantes' home in Browning. The La-Plantes testified at trial that Smith entered their home without permission and

1. The parties agreed to this fact, which was included in a stipulation read to the jury.

threatened to kill their family because of their daughter's report to the FBI. Lori LaPlante testified that Smith said something like: "Because your daughter can't keep—or your kids can't keep their pencils in their pocket, my son is facing 20 years in prison." Galen LaPlante testified that Smith said: "My son is going to get 20 years because of your daughter." Both Lori and Galen LaPlante testified that Smith threatened to kill the LaPlante family and that Smith also said she was going to "kick [Lori LaPlante's] ass."[2] It is undisputed that Gordon Smith eventually walked toward the LaPlantes' home, that Galen LaPlante raised a gun, that Smith and Gordon Smith retreated, and that Lori LaPlante called the tribal police.

Tribal officer Shaundel Calf Boss Ribs ("Boss Ribs") responded to Lori LaPlante's call. Boss Ribs testified that she found the families arguing and that Galen LaPlante told her at the scene that the fight was about a witness statement the LaPlantes' daughter had made against Smith's son. Boss Ribs also testified that she heard Smith threaten to "kick [Lori LaPlante's] ass" and that at some point Smith referred to Lori LaPlante's "f'ing daughter."

After a one-day trial, a jury convicted Smith of retaliating against a federal witness, the LaPlantes' daughter, by threatening her family.[3] The district court sentenced Smith on October 10, 2003. The court calculated an initial base offense level of twelve but increased the level to twenty because Smith threatened bodily injury. U.S. Sentencing Guidelines Manu-

al § 2J1.2(b)(1) (2002). Smith's offense level and one-point criminal history category resulted in a thirty-three—to forty-one month sentencing range. The district court denied Smith's requests for downward departure and sentenced her to thirty-three months. It noted that Smith had submitted more family and community letters of support than the court had seen in any other case.

## II.

Smith argues that the district court lacked jurisdiction over her prosecution because retaliating against a witness is not a crime listed in the Major Crimes Act, 18 U.S.C. § 1153, which extends federal jurisdiction to specific crimes committed by and against Indians in Indian Country. This argument is foreclosed by *United States v. Begay*, 42 F.3d 486 (9th Cir.1994).

## A.

■ We explained in *Begay* that federal criminal laws of "nationwide applicability" apply to Indians within Indian country just as they apply elsewhere. *Id.* at 499; *see also United States v. Errol D., Jr.*, 292 F.3d 1159, 1164–65 (9th Cir.2002) (stating that 18 U.S.C. § 641, which prohibits the theft of government property, applies to Indians in Indian country); *United States v. Young*, 936 F.2d 1050, 1055 (9th Cir. 1991) (per curiam) (holding that 18 U.S.C. § 111, which prohibits assaults on federal officers; 18 U.S.C. § 922(g), which prohibits the possession of a firearm by a convicted felon; and 18 U.S.C. § 924(c), which penalizes the use of a firearm during a

---

**2.** Smith admitted at trial, on direct examination, that she knew of the charges against her son when she went to the LaPlantes' home, but she denied threatening the LaPlantes. Smith testified that she and Galen LaPlante argued about an unrelated property matter.

**3.** The district court instructed the jury that in order to convict Smith, it had to find that she "knowingly threatened to cause bodily injury to Galen and Lori LaPlante" and that she "did so intending to retaliate against Kari LaPlante for information she had given to law enforcement."

crime of violence; are all federal laws of nationwide applicability that may be applied to Indians in Indian country); WILLIAM C. CANBY, AMERICAN INDIANLAW 153 (4th ed.2004) (citing more examples). Laws of "nationwide applicability" are laws "that make actions criminal wherever committed." *Begay,* 42 F.3d at 498.

The statute on which Smith relies—18 U.S.C. § 1153—extends federal law that applies in federal enclaves (*e.g.,* military bases) to govern certain "major" crimes when committed by Indians against Indians in Indian country.[4] *Id.* at 498; Canby, *supra,* at 165–66. Section 1153 pertains only to federal enclave laws—laws that make the " 'situs of the offense' " an element of the crime. *Begay,* 42 F.3d at 498 (quoting *United States v. Strong,* 778 F.2d 1393, 1396 (9th Cir.1985) (per curiam)); *see also United States v. Brisk,* 171 F.3d 514, 520 (7th Cir.1999). *Begay* held that the list of major crimes in § 1153 does not act as a limit on federal jurisdiction over other crimes that violate nationally applicable laws. *Begay,* 42 F.3d at 498.

### B.

Smith was convicted of retaliating against a federal witness in violation of 18 U.S.C. § 1513(b), which provides:

Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

. . .

(2) any information relating to the commission or possible commission of a Federal offense . . .;

or attempts to do so, shall be fined under this title or imprisoned not more than ten years, or both.

As this quotation makes clear, § 1513(b)(2) does not make situs an element of the offense. Accordingly, § 1513(b)(2) is a law of nationwide applicability and is presumed to apply to crimes committed by and against Indians in Indian country.[5] *See Begay,* 42 F.3d at 499.

### C.

Smith relies on the following passage in *Begay* to argue that § 1513 does not operate as a statute of nationwide applicability in her case: "Ninth Circuit law clearly allows Indians to be charged under federal criminal statutes of nationwide applicability if the charge is not *otherwise affected by federal enclave law* (*e.g.,* the Major Crimes Act, § 1153). . . ." *Id.* at 500 (emphasis added). Smith contends that the charge

---

**4.** As Smith points out, § 1153 is not a source of jurisdiction in this case because retaliating against a witness is not listed in the statute as a "major" crime.

**5.** The presumption that nationally applicable laws apply to Indians in Indian country may be rebutted in three ways:

A federal statute of general applicability . . . will not apply to [Indian in Indian Country] if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that

Congress intended [the law] not to apply to Indians on their reservations. . . .

*Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1116 (9th Cir.1985) (second alteration in original) (citation and internal quotation marks omitted). We have not always considered these exceptions *sua sponte, see, e.g., Begay,* 42 F.3d at 498–99, and Judge Canby has written that they need only be considered when a crime consists of a violation of a regulatory regime. CANBY, *supra,* at 155–56. Smith does not argue that any of the *Coeur d'Alene* exceptions apply in her case.

against her is "affected by federal enclave law" because the underlying crime—the burglary allegedly committed by Smith's son—is an enclave crime. *See* 18 U.S.C. § 1153(a) (listing burglary).

*Begay* itself undermines Smith's theory. Begay and his co-defendants were charged under the general conspiracy statute, 18 U.S.C. § 371, with conspiring to commit two enclave crimes on the Navajo reservation—kidnapping and assault. *See Begay,* 42 F.3d at 497, 501. In holding that the district court had jurisdiction, the panel was not troubled by the fact that the predicate crimes were enclave crimes. *See id.* at 500–01; CANBY, *supra,* at 154 (stating that the "court of appeals [in *Begay*] rejected a contention that linking conspiracy with major crimes impermissibly extended the scope of the Major Crimes Act beyond that intended by Congress."). In fact, in *United States v. Laughing,* 855 F.2d 659, 660 (9th Cir.1988) (per curiam), we held that the district court had jurisdiction over a charge that the defendant used a firearm in relation to a crime of violence precisely because the underlying crime, assault, is listed in § 1153. *See also Standing Bear v. United States,* 68 F.3d 271, 272 (8th Cir.1995) (per curiam) (similar to *Laughing* ).

■ Smith contends that there could have been no federal jurisdiction over the underlying burglary allegedly committed by her son because burglary is defined for federal purposes by Montana law. *See* 18 U.S.C. § 1153(b) (stating that major crimes not defined in federal law shall be defined and punished according to the laws of the state in which the crime was committed). As Smith recognizes, we have rejected a nearly identical argument. *See United States v. Male Juvenile,* 280 F.3d 1008, 1018 (9th Cir.2002) (rejecting the defendant's argument that "because his act of delinquency[burglary] was determined

by reference to substantive state law, his violation of section 1153 did not constitute a 'violation of the law of the United States' "). Contrary to Smith's assertion, there is no conflict between *Male Juvenile* and the general policy of "leaving Indians free from state jurisdiction and control." *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945). Burglary committed in violation of § 1153 is a *federal* offense, *see Male Juvenile,* 280 F.3d at 1018, and a federal prosecution would not place Smith's son under Montana's jurisdiction or control. There is no state intrusion into Indian country.

## III.

The district court calculated an initial base offense level of twelve but increased the offense level by eight levels pursuant to Sentencing Guidelines § 2J1.2(b)(1). Section 2J1.2(b)(1) provides for an eight-level increase if "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. . . ."

## A.

Smith reads the "obstruct ... justice" language in subsection (b)(1) as imposing an intent requirement different from the intent to retaliate required for a conviction under 18 U.S.C. § 1513(b)(2). She argues that although she may have acted with a backward-looking intent to retaliate, there is no evidence she acted with a forward-looking, specific intent to obstruct justice.

■ We join the First Circuit in rejecting Smith's argument, at least as applied to facts such as those in this case. *See United States v. Weston,* 960 F.2d 212 (1st Cir.1992), *abrogated on other grounds by Stinson v. United States,* 508 U.S. 36, 39–42, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

Although one might dispute in the abstract whether an intent to retaliate will always also include an intent to obstruct justice, Smith's act of retaliation occurred while Smith knew that a burglary charge was pending against her son. *See supra* note 2. Given this fact, Smith's retaliatory intent inevitably operated to obstruct justice, as Smith threatened a witness who would presumably have provided additional assistance to the government as its burglary prosecution progressed. *See Weston,* 960 F.2d at 219 ("We are of the opinion that ... conduct such as the court below supportably attributed to Weston—threatening a witness with physical injury in retaliation for the witness' past cooperation with federal authorities, while the federal criminal proceeding in question is still pending—can trigger an elevation of the defendant's offense level under U.S.S.G. § 2J1.2(b)(1)."); *cf. United States v. Weber,* 320 F.3d 1047, 1050–51 (9th Cir.2003) (holding that sufficient evidence supported a conviction for obstruction of justice under 18 U.S.C. § 1503 where the defendant left a threatening message for the federal judge who issued an arrest warrant for him and knew of the arrest warrant when he left the message). In these circumstances, the jury's findings that Smith "knowingly threatened to cause bodily injury" to the LaPlantes and that she "did so intending to retaliate against Kari La-Plante" provide adequate support for the § 2J1.2(b)(1) offense level increase.[6]

### B.

Smith argues that the district court erred in imposing the eight-level increase

because hers was not a "more serious" form of obstruction. U.S. SENTENCING GUIDELINES MANUAL § 2J1.2 cmt. background (2002). Smith reads the background commentary to § 2J1.2 as imposing a "serious[ness]" requirement in addition to subsection (b)(1)'s "specific offense characteristic[ ]"—namely the requirement that Smith threatened physical injury. The background commentary on which Smith relies does not support her interpretation. It indicates that the goal of limiting the eight-level increase to "more serious forms of obstruction" is achieved by the specific offense characteristics themselves. *Id.* ("The specific offense characteristics reflect the more serious forms of obstruction."); *see also United States v. Plumley,* 207 F.3d 1086, 1090 (8th Cir. 2000) (holding that § 2J1.2(b)(1) "does not impose an additional 'seriousness' requirement beyond the fact of a violent threat").

### C.

Smith points out that without the eight-level increase provided for in § 2J1.2(b)(1), she would have faced only a ten- to sixteen-month sentencing range. The government concedes that in this situation, the district court should have applied a clear and convincing standard of proof for any factual findings necessary to support the offense level increase. *See United States v. Jordan,* 256 F.3d 922, 927–29 (9th Cir.2001). Although it is not clear from the record what standard of proof the district court intended to apply, there was no *Jordan* error because in this case, the

---

**6.** We note that our holding is limited, much as *Weston's* was. The Seventh Circuit has held that the § 2J1.2(b)(1) offense level increase may be imposed even if no judicial proceeding was pending at the relevant time, because the purpose of § 2J1.2(b)(1) is only to "distinguish threats of physical injury or property damage from lesser threats," not to

"introduce refined distinctions within the broad category of obstruction of justice." *United States v. Duarte,* 28 F.3d 47, 48 (7th Cir.1994). We need not go as far as the Seventh Circuit, as this case does not require us to address whether the "obstruct ... justice" language applies where no future impact is possible.

district court did not have to make *any* factual findings in order to impose the § 2J1.2(b)(1) increase. The parties stipulated to the fact of Wesley Crawford's June 24, 2002 indictment, and Smith admitted on direct examination that she knew of the charge when she went to the LaPlantes' home. Given these facts, the enhancement is adequately supported by the jury's findings that Smith threatened physical injury and that she did so intending to retaliate. *See United States v. Bonilla–Montenegro,* 331 F.3d 1047, 1050 (9th Cir.2003) (affirming sentence even though district court erred in applying only a preponderance standard because record contained evidence that met the clear and convincing standard), *cert. denied,* —— U.S. ——, 124 S.Ct. 1487, 158 L.Ed.2d 136 (2004).

Of course, under our recent decision in *United States v. Ameline,* 376 F.3d 967 (9th Cir.2004), a challenge to the district court's standard of proof is somewhat beside the point. *Id.* at 974–78, 980–83 (applying *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to hold applications of the federal Sentencing Guidelines unconstitutional to the extent that they require the imposition of higher sentences on the basis of judicial factfinding). We face no *Ameline* problem in this case, however, because the enhancement is supported by admitted facts and by the jury verdict, not by district court factual findings. Still, our analysis assumes that the Guidelines are severable and may still be applied in cases that do not present specific *Blakely* issues. *Cf. United States v. Booker,* 375 F.3d 508, 515 (7th Cir.2004) (declining to decide the issue of severability but recognizing that "in cases where there are ... no factual findings by the judge increasing the sentence," there may be a constitutional violation if, and only if, "the guidelines are invalid in their entirety"), *cert. granted,* —— U.S.

——, 125 S.Ct. 11, 159 L.Ed.2d 838 (2004) (No. 04–104). We anticipate that the Supreme Court will provide guidance on this question when it reviews *Booker* and *Fanfan v. United States,* No. 03–47, 2004 WL 1723114 (D.Me. June 28, 2004), *cert. granted,* —— U.S. ——, 125 S.Ct. 12, 159 L.Ed.2d 838 (2004) (No. 04–105). Because we hold that we must remand for resentencing on another ground, *see infra* Part IV.B, we direct the district court to consider the Supreme Court's eventual decisions in those cases when it resentences Smith.

## IV.

Smith argued for a downward departure on three grounds: (1) her crime fell outside the heartland, *see* 18 U.S.C. § 3553(b); (2) the totality of the circumstances favored departure, *see United States v. Cook,* 938 F.2d 149, 153 (9th Cir.1991); and (3) her crime constituted "aberrant behavior," U.S. Sentencing Guidelines Manual § 5K2.20. The district court declined to depart downward, and Smith appeals the district court's decision on each ground.

## A.

■ We do not have jurisdiction to review a discretionary denial of a downward departure. *See United States v. Tam,* 240 F.3d 797, 805 (9th Cir.2001) ("We lack jurisdiction to review a district court's decision not to grant a discretionary downward departure absent evidence that the district court believed it lacked the authority to do so."); *see also United States v. Garcia–Garcia,* 927 F.2d 489, 491 (9th Cir. 1991) (per curiam) (holding that a district court's "silence regarding authority to depart is not sufficient to indicate that the court believed it lacked power to depart"). It appears from a review of the record that the district court believed it had the au-

thority to depart downward on heartland and totality-of-the-circumstances grounds, but chose not to depart on those grounds as a matter of discretion. Accordingly, we lack jurisdiction to review the district court's decision as to those two potential departures.

### B.

The district court's decision with respect to the aberrant behavior departure presents a different situation. The aberrant behavior departure is guided by the policy statement in § 5K2.20 of the Guidelines. The 2002 version of that section provided that a district court could depart downward in an "extraordinary" case if the defendant's behavior was truly "aberrant." The section defined "aberrant," in turn, as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represent[ed] a marked deviation by the defendant from an otherwise law-abiding life." U.S. SENTENCING GUIDELINES MANUAL § 5K2.20 cmt. n. 1 (2002).

Although we do not have jurisdiction to review a discretionary decision not to depart downward, the district court indicated in this case that it viewed the requirements of § 5K2.20 as limiting its authority to depart.[7] The district court then went on to make factual determinations related to the § 5K2.20 policy statement; the district court found evidence of "significant planning," found that Smith's crime "went on for some period of time," and found Smith's case not to be extraordinary. The district court did use the word "discretion" at one point in connection with its decision as to the aberrant behavior departure, but because it also indicated that it believed § 5K2.20 limited its authority, we cannot fairly determine whether the district court understood and exercised its discretion. Accordingly, we will review the factual determinations that the district court did make and will remand for an exercise of discretion if those determinations were clearly erroneous.[8] *See United States v. Dickey,* 924 F.2d 836, 838–39 (9th Cir. 1991) (analyzing the issue of what constitutes aberrant behavior and remanding for an exercise of discretion with respect to an aberrant behavior departure where it was not clear from the record whether the district court exercised its discretion or believed it lacked the authority to depart); *see also United States v. Roe,* 976 F.2d 1216, 1218 & n. 1 (9th Cir.1992) (reversing, under a clearly erroneous standard, a district court's determination that it could not depart downward because the defendant's case was not "extraordinary," and explaining that the appellate court had jurisdiction because it was "not reviewing the district court's discretionary decision,"

---

7. The district court noted that "there are specific declarations in the guidelines with regard to" the aberrant behavior departure. The district court also referred to the "significant planning" language in the Application Notes as a "limitation[] upon an aberrant behavior finding."

These indications that the district court believed its authority to be limited distinguish this case from *United States v. Rearden,* 349 F.3d 608 (9th Cir.2003), *cert. denied,* — U.S. ——, 125 S.Ct. 32, — L.Ed.2d —— (2004). In *Rearden,* the district court declined to depart downward in a child pornography case

because it could not conclude that the defendant was unfamiliar with child pornography given his writings. *Id.* at 617. The district court was apparently silent on the issue of its authority to depart, bringing *Rearden* within the *Garcia–Garcia* line of cases. *See Garcia–Garcia,* 927 F.2d at 491 (holding that a district court's silence regarding its authority to depart does not provide a sufficient basis for appellate review).

8. We note that when asked at oral argument, the government agreed that we could review the district court's factual determinations.

only a "factual finding that the district court believed prevented it from exercising its discretion").

### 1.

■ The district court indicated that it believed Smith's crime was the product of "significant planning." Having reviewed the record, we are left with a "definite and firm conviction" that the district court erred in making this determination. *United States v. Asagba,* 77 F.3d 324, 326 (9th Cir.1996).

Although the district court pointed out that Smith committed the crime in Browning but lived primarily in Phoenix, Lori LaPlante testified that Smith and her family generally used their Browning home "in the summer and [on] holidays." [9] Given this testimony, and the fact that Smith committed the crime on July 16, "significant planning" cannot be inferred merely from Smith's presence in Browning. The government emphasized at oral argument that some time elapsed between when Smith learned of the LaPlantes' daughter's involvement and when she threatened the LaPlante family. But the fact that Smith may have had time to plan a retaliatory act does not tend to prove that her crime was, in fact, the product of "significant planning." The only relevant evidence in the record appears to be the nature of the crime itself, and it is clear from the record that Smith's crime was not one for which "significant planning" would ordinarily be required.

### 2.

The district court found that Smith's criminal activity "went on for some period of time." *See* UNITED STATES SENTENCING GUIDELINES MANUAL § 5K2.20 cmt. n. 1 (defining "aberrant be-

havior" as a single occurrence or transaction of "limited duration"). Again, we are left with a "definite and firm conviction" that the district court erred in making this finding. *Asagba,* 77 F.3d at 326.

Galen LaPlante testified that Smith "ranted and raved" for five or ten minutes. Even taking into account the time it must have taken the tribal police to arrive on the scene, it is clear that this crime was of very short duration as compared to other cases involving aberrant behavior departures. *See United States v. Working,* 224 F.3d 1093, 1096, 1100 (9th Cir.2000) (en banc) (affirming the district court's decision that the defendant's behavior was aberrant where, inter alia, the events leading to the crime took place at most over the course of one week, not over a "long period" of time); *United States v. Pierson,* 121 F.3d 560, 564–65 (9th Cir.1997) (affirming the district court's decision not to depart on aberrant behavior grounds because, inter alia, the defendant's participation in a cocaine distribution scheme spanned a period of at least eight months); *United States v. Green,* 105 F.3d 1321, 1322–23 (9th Cir.1997) (holding that the district court abused its discretion in departing downward on aberrant behavior grounds because, inter alia, the defendant's criminal activity lasted for at least a few months, perhaps two years); *see also United States v. May,* 359 F.3d 683, 693 n. 17 (4th Cir.2004) (stating that the defendant's behavior likely could not be considered aberrant because the offense conduct continued for one month, not one evening as the defendant contended).

### 3.

The district court found that Smith's case was not extraordinary, but it did not provide reasons in addition to its factual determinations as to planning and dura-

9. The government conceded this point at oral argument.

tion. *Cf. United States v. Guerrero*, 333 F.3d 1078, 1081–82 (9th Cir.2003) (holding that the "extraordinary" language in § 5K2.20 imposed a requirement separate from the three-part definition of "aberrant behavior" in the section's first Application Note). Because it appears that the district court's "not extraordinary" determination may have been affected by those erroneous factual findings, we remand so that the district court may consider the "extraordinary" requirement in light of our analysis.

In doing so, we emphasize the substantial evidence in the record that Smith's case *is* extraordinary. Smith and the La-Plantes are long-time neighbors and closely-related family members. Galen La-Plante testified at Smith's sentencing hearing that there had never been any problems among them before July 16, 2002, and, as the government conceded at oral argument, it was actually Galen La-Plante who "escalated" the July 16 incident by brandishing a gun. The many letters of support for Smith that are included in the record also document what appears to have been an exemplary life, not just a law-abiding one. The letters indicate that Smith overcame childhood disadvantages in order to earn a nursing degree; that many on the Blackfeet reservation view her as a role model and as a symbol of what one may achieve through hard work; that she has two young children and that her daughter was recently raped and her family's Phoenix house burned down; that her family depends on her income; and that she has tirelessly cared for and supported a disabled brother.

### 4.

As the government conceded at oral argument, Smith has been a law-abiding citizen, and this crime represents a departure from her "normal way of life." The district court's analysis of the aberrant behavior issue rested on clearly erroneous factual findings, and it is not clear from the record that the district court understood its authority and declined to depart as a matter of discretion. Accordingly, we remand for further consideration of the aberrant behavior departure.

### V.

For the foregoing reasons, we affirm Smith's conviction and the district court's application of § 2J1.2. We remand Smith's request for a downward departure for aberrant behavior for further consideration consistent with this opinion. In light of the uncertainties as to the fate of the Sentencing Guidelines, we direct the district court to consider the Supreme Court's eventual decisions in *Booker* and *Fanfan* when it resentences Smith.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.**