**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOHN L. CALVERT,
*Defendant-Appellant.*

No. 06-30643

D.C. No.
CR-99-00154-EFS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
September 28, 2007—Seattle, Washington

Filed January 14, 2008

Before: Betty B. Fletcher and Ronald M. Gould,
Circuit Judges, and Stephen G. Larson,* District Judge.

Opinion by Judge Larson;
Concurrence by Judge B. Fletcher

*The Honorable Stephen G. Larson, United States District Judge for the Central District of California, sitting by designation.

## COUNSEL

Richard D. Wall, Esq., Spokane, Washington, for the appellant.

Thomas O. Rice, Office of the United States Attorney, Spokane, Washington, for the appellee.

---

## OPINION

LARSON, District Judge:

Today we resolve a sentencing guideline question left open in our decision in *United States v. Smith*: When someone is convicted of retaliating against a federal witness in violation of 18 U.S.C. § 1513(b), may the eight-level increase found in United States Sentencing Guidelines ("USSG") § 2J1.2(b)(1) (Nov. 2000) for an offense "causing or threatening to cause physical injury to a person . . . in order to obstruct the administration of justice" be imposed even if no judicial proceeding was pending at the relevant time? 387 F.3d 826, 831 n.6 (9th Cir. 2004). The district court, following the lead of the Seventh Circuit in *United States v. Duarte*, 28 F.3d 47 (7th Cir. 1994), found such an increase permissible. For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

At 8 p.m. on June 4, 1998, Timothy Tyler knocked on the door to Clyde and Geraldine Overdorff's home in Spokane, Washington. When Clyde opened the door Tyler inquired about a motor home the elderly couple had for sale on their premises. Clyde took Tyler around to the back of the home to show him the motor home. Shortly thereafter, Geraldine heard a commotion in the back yard. Peering out the side door, Geraldine spied Tyler pushing Clyde back toward the house at gun point. Once inside the elderly couple's home, Tyler forced them to sit in two dining room chairs and then bound their wrists to the chairs with plastic ties. At some point, Geraldine pleaded with Tyler to leave, to which he responded, "I don't like this any more than you do."

Shortly thereafter Tyler took Geraldine to the bathroom, left her there, and went back to the dining room. Moments later Geraldine heard three gunshots. She immediately called 9-1-1. Clyde came staggering to the bathroom and told her that he had been shot by Tyler, but that he had managed to shoot Tyler as well (Clyde had surreptitiously retrieved a gun from the kitchen at some point during the home invasion). Geraldine observed Tyler lying on the floor in the living room; he later died at the hospital.

Clyde had been shot in the abdomen, the bullet wound placing him in intensive care at the hospital for two and a half months and requiring that he receive extensive physical rehabilitation and nursing care.

The ensuing investigation into the home invasion of the Overdorffs' residence uncovered evidence indicating that Tyler was recruited to commit the crime by John Calvert. Authorities traced Calvert's motive, in turn, to a 1995 federal prosecution against one Richard Peters on federal tax evasion charges for hiding financial assets in Canada. One of the key government witnesses at the 1995 trial was Peters' longtime friend, Clyde Overdorff. Peters was convicted of the tax offenses and incarcerated at a federal correctional institution, where he met Calvert, who was incarcerated there at the time on a firearm offense.

While in prison Peters hatched a plot to seek retribution against Clyde Overdorff for testifying against him. After Calvert and Peters were released from prison, Calvert quickly became indebted to Peters in the sum of $60,000. In exchange for forgiveness of the debt, Calvert agreed to plan and participate in the robbery at the Overdorffs' home to make real Peters' vengeful desires. Calvert recruited Tyler to help him carry out the deed, accompanied Tyler to the Overdorffs' home on the night in question, and served as the look-out and driver of the getaway car.

Calvert was later arrested by authorities and then convicted by a jury in March, 2001, of conspiracy to retaliate against a witness, a violation of 18 U.S.C. § 371, retaliation against a witness, a violation of 18 U.S.C. § 1513(b), use of a firearm during a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A), and for being a convicted felon in possession of a firearm, a violation of 18 U.S.C. § 922(g).

After numerous sentencing hearings, impositions of sentence by the district court, and multiple appeals to and remands from this court, Calvert was sentenced on November 30, 2006, to sixty months on the conspiracy count, ninety months on both the retaliation and felon in possession counts (which were to run concurrently with one another but consecutively with the remaining counts), and 120 months on the use of a firearm count (running consecutively with the other counts), for a total of 270 months in federal prison.

A point of contention in arriving at this sentence was whether the eight-level enhancement found in USSG § 2J1.2(b)(1) was applicable to Calvert's sentence on the witness retaliation-related counts even though, at the time of the home invasion robbery, Peters had already been convicted, had completed his prison sentence, had been released from custody, and was not facing any threat of future prosecution, thus eliminating any prospect for Clyde Overdorff to testify as a witness against him. The district court concluded that the enhancement applied. It is to that issue that we now turn.

## DOES APPLICATION OF § 2J1.2(b)(1) TO AN INDIVIDUAL CONVICTED OF RETALIATING AGAINST A WITNESS REQUIRE THE PENDENCY OF A JUDICIAL PROCEEDING?

We follow "a two-step procedure for reviewing sentences imposed following the date the Supreme Court issued its opinion in *Booker*." *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006). Initially, we determine whether the district

court properly considered and applied the applicable guideline. *See United States v. Cantrell*, 433 F.3d 1269, 1279-81 (9th Cir. 2006). If the district court did not err in applying the guidelines, we then review the reasonableness of the sentence itself in light of the factors set forth in 18 U.S.C. § 3553(a). *Id*. at 1280. Calvert challenges only the district court's interpretation of the Guidelines in calculating his sentence, a question which we review *de novo*. *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006).

At the time Calvert was convicted, section 2J1.2(a) of the Guidelines provided a base offense level of twelve for several statutory offenses involving obstruction of justice, one of which is the witness-retaliation statute found at 18 U.S.C. § 1513. *See* USSG 2J1.2 cmt. statutory provisions (identifying the statutory provisions applicable to the Guideline as "18 U.S.C. §§ 1503, 1505-1513, [and] 1516"). The Guideline further provides for an eight-level enhancement in the base offense level for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." USSG § 2J1.2(b)(1).

Seizing on the "in order to obstruct the administration of justice" language in the Guideline enhancement, Calvert makes the unremarkable proposition that the increase only applies where the defendant acts with an intent to obstruct the administration of justice. From this base, Calvert leads in a direction that we decline to follow.

In Calvert's view, an intent to retaliate against a witness does not necessarily include an intent to obstruct justice. This is so, he contends, because the obstruction element is met only where there is something that could presently be affected by that act. Without the existence of some *pending* judicial proceeding at the moment of retaliation, Calvert argues, there is simply nothing in the justice system to obstruct through that act. Such an argument posits that the administration of justice entails nothing more than the conduct of discrete proceedings.

Grand jury proceedings and trials are, in this view, more than just the archetypes for the administration of justice; they are its *sine qua non* and, hence, their presence is essential to satisfying the intent element set forth in the Guideline.

Applied to the facts of this case, Calvert argues that no intent to obstruct can be inferred because Peters was under no threat of prosecution at the time the offense was committed, having been convicted and completed his sentence when the crime occurred. In this sense, the present case is unlike the one we were presented with in *Smith* where the defendant's "act of retaliation occurred while [the defendant] knew that a burglary charge was pending against her son" and thus her "retaliatory intent inevitably operated to obstruct justice, as [she] threatened a witness who would presumably have provided additional assistance to the government as its burglary prosecution progressed." 387 F.3d at 831.

In the absence of a pending judicial proceeding, Calvert argues that he can only be said to have been motivated purely by a desire for revenge. Calvert thus seeks to draw a distinction rejected by the Seventh Circuit "between vengeful and instrumental retaliations," with only the latter punished more harshly. *Duarte*, 28 F.3d at 49. We reject such a distinction in the context of the witness-retaliation statute as we find it predicated upon an overly cramped conception of the justice system.

**[1]** Lost in Calvert's argument is any recognition of the particular predicate offense of which he was convicted. Calvert was not convicted of simply causing bodily injury to Clyde Overdorff to seek revenge in the abstract, but of doing so *because Clyde testified as a witness for the government* in the criminal trial against Peters. Towards that end, the jury was instructed that, to convict Calvert of the crime, he must have acted "with the intent to retaliate against Clyde Overdorff because he had been a witness at a federal criminal trial." It is this intent to harm someone *because he or she is or was a*

*witness* that satisfies § 2J1.2(b)(1)'s element requiring an intent to obstruct the administration of justice. Intending to physically harm someone due to their service as a witness fundamentally contravenes and undermines the administration of justice.

There are certain components in the justice system without which it could not function. Witnesses are among these essential components. Witnesses (and the service they provide) are the engine, for want of a better phrase, from which much of the output from the machinery (the discrete judicial proceedings referenced by Calvert) in the justice system is produced. Without their information, and their willingness to take the very public and visible role of furnishing sworn testimony at trial, our criminal justice system could not function. The ability of law enforcement officers and prosecutors to discover and prove criminal activity turns on their ability to recruit witnesses willing to truthfully testify in a public court of law.

**[2]** Admittedly, where a witness suffers retribution after a verdict is rendered, the effect on the administration of justice is not as direct and immediate (lacking an identifiable proceeding that could be disrupted as a result of the conduct) as would be the case where a star witness is beaten or killed on the eve of trial. However, that the conduct lacks a direct and immediate impact does not mean the conduct is in any way less pernicious to the effective administration of justice. There is more to the administration of justice than ensuring the integrity of the machinery employed in conducting and concluding a particular proceeding; rather, it most assuredly also requires the continued respect and cooperation by the citizenry for upholding the law in general. Such continued respect and cooperation is brought into serious question when those who have assisted authorities in the past become targets because of their dutiful cooperation. What causes individuals apprehension in coming forward and providing information to authorities is not just that they may be harmed before or during a trial, but that such harm will be exacted against them at

all, the timing of when such retaliation will occur being irrelevant.

**[3]** Calvert's intent in this case to harm someone for giving testimony in a past criminal trial preys upon this fear, and perpetuates such apprehension by giving a concrete example of the feared retribution. Such retributive acts against former witnesses communicate an unmistakable message to society at large not to cross the defendant's path in particular, and that dissuades others from cooperating with authorities in general. Just because Peters did not have a pending proceeding against him does not detract from the chilling effect the offense in this case can have on witnesses in other cases, thus hindering the ability of federal law enforcement and prosecutors to gain their cooperation.

A witness having information that might be useful to authorities in a completely unrelated matter would have serious qualms about coming forward with such evidence after hearing of Clyde Overdorff's harrowing experience. Similarly, someone who has served as an informant for law enforcement (even in the absence of having any current information to provide) may decide to sever his or her relationship upon learning of retributive acts like those taken in this case. Attacking such a vital organ to the functioning of the justice system is so pernicious that the act itself amounts to an obstruction of justice with or without any connection to an identifiable discrete proceeding. Without a witness' willingness to come forward there would rarely, if ever, be a discrete judicial proceeding to conduct in the first instance.[1]

---

[1]The concurrence's suggestion that the preceding discussion is "surplusage," containing little more than our "philosophical perspective" and likely to invite "mischief," is puzzling given that it was the suggestion in *Smith* (which was written by the author of the concurrence) that "one might dispute in the abstract whether an intent to retaliate will always also include an intent to obstruct justice," 387 F.3d at 831, the very suggestion seized upon by Calvert in this appeal, that necessitated that we provide an explanation for why such is not the case.

In this context, it must also not be forgotten that for the eight-level enhancement to apply, the Guideline requires that the intent to retaliate have been carried out in a particular manner: The defendant must have either caused or threatened to cause property damage or physical injury to the witness. Trivial retaliatory acts will not do; the enhancement is reserved for serious acts used "as a means of intimidation." USSG § 2J1.2 cmt. application note 5. This point is picked up by the Guideline's commentary that "[t]he specific offense characteristics [found in sections 2J1.2(b)(1)-(2)] reflect the *more serious forms of obstruction*." USSG § 2J.1 cmt. background (emphasis added). Indeed, even this "serious form" of obstruction captured in § 2J1.2(b)(1) is considered a floor, as the Guideline's application notes reference the possibility for a further upward departure "[i]f a weapon was used, or bodily injury or significant property damage resulted." USSG 2J1.2 cmt. application note 4. It is in this sense that the Seventh Circuit's statement in *Duarte*, that the intent to retaliate against a witness for conduct to which the enhancement otherwise applies has the "invariable tendency" to impede the administration of justice, holds meaning in this case. 28 F.3d at 48.

**[4]** Congress made this same observation in enacting the witness-retaliation statute by placing the statute among the various crimes codified in Chapter 73 to Title 18 of the United States Code, which is itself entitled "Obstruction of Justice." The placement of certain prohibited acts in this chapter strongly indicates that the intent to commit such an act amounts to an intent to obstruct justice. *See Duarte*, 28 F.3d at 48-49 ("The witness-retaliation statute punishes conduct calculated to impede the administration of justice — that is . . . the purpose of making witness retaliation a separate crime (codified in the chapter of Title 18 (ch. 73) that is entitled — 'Obstruction of Justice') from assaults and threats generally").

**[5]** Moreover, in enacting the witness-retaliation statute, Congress made clear that the pendency of a judicial proceeding was unnecessary to support a conviction. The statute's use

of the past tense, and the use of the term "retaliate," both make clear that the elements of the offense are satisfied where "bodily injury" is inflicted as reprisal for prior testimony. *See* 18 U.S.C. § 1513(b)(1) ("Whoever knowingly engages in any conduct and thereby causes bodily injury to another person . . . with intent to *retaliate* against any person for . . . any testimony *given* . . . by a witness in an official proceeding" (emphasis added)); *see also* WEBSTER'S UNIVERSITY DICTIONARY 1003 (3rd ed. 1994) (defining "retaliate" as meaning "to pay back (an injury) in kind"). That is to say, the statute covers conduct occurring *after* the witness's involvement in a proceeding has ended. The failure to include the element of a pending judicial proceeding was not an oversight on Congress' part; rather, it was a conscious choice stemming from the recognition that retaliating against a witness for his or her service regardless of when the retaliation occurred tended to obstruct the administration of justice. As expressed in the Senate Report accompanying the passage of section 1513:

> These hearings and studies have shown repeatedly that too often the victim has been the "forgotten person" in the criminal justice system. With few exceptions, victims and witnesses are either ignored by the criminal justice system or simply used to identify offenders. . . . [T]he victim or witness who cooperates with the prosecutor often does so at his own risk. The victim or witness has little hope of protection from the government if he is harassed or threatened by the defendant out on bail, or the defendant's friends or family; *or if the convicted criminal, after serving his time, decides to retaliate against the individual who assisted the government*. This insensitivity and lack of concern for the victim and witness is a tragic failing in our criminal justice system, one which hurts the whole society. Without the cooperation of victims and witnesses, the criminal justice system would simply cease to function and few criminals, if any, would be brought to justice.

S. REP. NO. 97-532 at 10 (1982) (emphasis added), *reprinted in* 1982 U.S.S.C.A.N. 2515, 2516.

**[6]** The intent to retaliate against someone for being a witness therefore is itself an intent to obstruct the administration of justice.

Calvert responds that, absent such a pending judicial proceeding, the enhancement in § 2J1.2(b)(1)(A) would apply whenever there is injury or threatened injury to persons or property. Calvert's argument goes back to his cramped notion of the justice system as it ignores one crucial element that is present in any conviction, like his, for a violation of 18 U.S.C. § 1513(b): The retaliation against the individual must occur because of the victim's status as a witness in a past or present proceeding. This element links a key component in the administration of justice — the service provided by a witness — with the intent underlying the crime. It is this linkage that distinguishes the crime at issue from more general crimes involving causing injury or threatened injury to someone. *See Duarte*, 28 F.3d at 48-49. The intent to retaliate against someone *because he or she was a witness* includes within it (because of the central role witnesses serve in the justice system itself) the intent to hinder or impede the administration of justice.

Nor does Calvert's effort to festoon onto the intent element found in the Guideline an across-the-board requirement for a pending judicial proceeding or investigation find support in the language of the Guideline. To begin, the critical phrase in the Guideline ("in order to obstruct the administration of justice") is, as one court has noted, "anything but self-defining," such that "[m]any kinds of actions and many kinds of outcomes can fit linguistically within the phrase's loosely woven confines." *United States v. Weston*, 960 F.2d 212, 219 (1st Cir. 1992), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36, 39-42 (1993). Whether the intent to commit a particular act amounts to an intent to obstruct justice is

necessarily defined by and dependent upon the criminal act in question. The commentary to § 2J1.2(b)(1) bears out this observation in relation to the crime of witness-retaliation. Comment 5 to the Guideline's application notes explicitly contemplates application of the enhancement for a strict retaliatory act, without regard to whether a judicial proceeding is pending: "The inclusion of 'property damage' under subsection (b)(1) is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (*e.g.*, to intimidate a witness from, *or retaliate against a witness for*, testifying)." USSG § 2J1.2(b)(1) cmt. application note 5 (emphasis added). Similarly, the Background commentary describes among the "numerous offenses" that "may constitute obstruction of justice . . . causing a witness bodily injury . . . *in retaliation for providing testimony* . . . ." USSG § 2J1.2, cmt. background (emphasis added). This is accentuated by the Background in the Guideline's commentary recognizing that "the conduct covered by this guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense." *Id.* That the conduct covered by the Guideline "frequently" is done in an effort to thwart an identifiable proceeding or investigation against someone necessarily means that it does not "always" have to be tied to such a proceeding.

Neither the Guideline nor this commentary states, or even reasonably implies, that the "retaliation" referred to must take place while a judicial proceeding is still pending. Rather, it is the victim's act of serving as a witness, not whether the witness retains any further utility in an ongoing or contemplated proceeding, that the Guideline's commentary views as the critical element integrating the witness-retaliation statute within the ambit of the Guideline's terms. Absent some contrary indication, we accept as controlling these statements in the commentary that purely retaliatory acts against a witness would serve to impose the enhancement. *See United States v. Lambert*, 498 F.3d 963, 966 (9th Cir. 2007) ("[The Guide-

lines'] commentary is generally authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline" (internal quotation marks omitted)).

**[7]** Calvert intended to retaliate against Clyde Overdorff for his service as a witness in a past criminal trial; in doing so Calvert's offense was committed "in order to obstruct the administration of justice." The imposition of the eight-level enhancement in § 2J1.2(b)(1) was proper.

AFFIRMED.

---

B. FLETCHER, Circuit Judge, specially concurring:

Because I agree that the eight-level sentencing enhancement in U.S.S.G. § 2J1.2(b)(1) (Nov. 2000) was properly applied in this case, I concur in the judgment. The Commentary to the Guidelines contemplate application of the § 2J1.2(b)(1) enhancement for a strictly retaliatory act, thus reaching Calvert's crime of conviction. U.S.S.G. § 2J1.2(b)(1) cmt. n.5 ("The inclusion of 'property damage' under subsection (b)(1) is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (*e.g.*, to intimidate a witness from, *or retaliate against a witness for*, testifying.") (emphasis added). Moreover, Calvert's relevant offense, 18 U.S.C. § 1513(b) (retaliation against a witness), is predicated on an intent to harm a witness and his jury made a specific finding that Calvert had such an intent. Little else is required to resolve Calvert's appeal.

The majority opinion, although advancing some worthwhile views on how the judicial system should operate, concerns me because it carries the troubling potential of mandating legal standards on issues that are not before us, and

have not been considered in the context of concrete facts raising genuine legal issues. The discussion of the interrelationship between retaliation against witnesses and the administration of justice generally is my concern. Maj. op. at 385-88. Nearly all of this discussion is dicta that is unnecessary to the resolution of this appeal. This is a Sentencing Guidelines case, and we do not assist the district courts by offering philosophical perspectives where concrete guidance is needed. Although I am reluctant to compound the problem with a separate concurrence, I feel compelled to clarify what we do *not* decide today. We do not identify or catalog "essential components" in the administration of justice relevant to § 2J1.2(b)(1). Maj. op. at 387. Nor do we embrace or reject a "direct and immediate impact" standard for the application of a § 2J1.2(b)(1) enhancement. Maj. op. at 387. We do not decide that § 2J1.2(b)(1) is properly applied where a defendant's acts affect the public's "respect and cooperation" in upholding the law. *Id.* We do not generally deem "irrelevant" the timing of a defendant's retaliatory act in determining whether § 2J1.2(b)(1) applies, or decide that § 2J1.2(b)(1) applies where a defendant's acts merely impose a "chilling effect" in unrelated proceedings. *Id.* Finally, we do not hold that § 2J1.2(b)(1) universally applies in all cases "with or without any connection to an identifiable discrete proceeding." Maj. op. at 388. The court's commentary on these points is purely surplusage. Although much of this language is spurred by the majority's good-faith desire to explain its decision, I reiterate that these words carry with them the troubling potential—as dicta often does—to be seen in future cases as legal standards that we have neither considered nor adopted.

We are charged with deciding only those issues presented in an appeal, based on the record before us. We invite mischief by straining unnecessarily to do more.